IN THE SUPREME COURT OF THE STATE OF DELAWARE

JOHN TRALA,                §

§

§     No. 480, 2019

Defendant-Below,        §

Appellant,           §

§

§     Court Below:

v.                  §     Superior Court

§     of the State of Delaware

§

STATE OF DELAWARE,     §

§

§

Plaintiff-Below,         §     C.A. No.  1903015323(S)

Appellee.           §

§

Submitted:    October 21, 2020
Decided:      December 22, 2020

Before **VALIHURA**, **VAUGHN**, and **TRAYNOR**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

Santino Ceccotti, Esquire (*argued*), Office of Public Defender, Wilmington, Delaware.

John R. Williams, Esquire (*argued*), Department of Justice, Dover, Delaware.

**VALIHURA**, Justice:

A Superior Court jury convicted Defendant–Below/Appellant John Trala of driving under the influence. Trala contends the trial court erred in denying his motion for a mistrial after the State, in its rebuttal argument, asserted that defense counsel's lack of evidentiary objections to certain witness testimony relating to Trala's blood chemical analysis suggested that defense counsel had acknowledged the reliability of that incriminating evidence. He also claims he was denied a fair trial because the prosecutor, in a rebuttal remark, expressed her favorable personal opinion as to the credibility of the arresting officer who was a key witness for the State.

The jury specifically found both that Trala drove while under the influence of alcohol, and that he drove while his blood alcohol concentration was above the DUI threshold, two independent theories of liability supporting the same DUI charge.[1] In light of that dual holding, which is supported by overwhelming evidence, any error arising from the prosecutor's misconduct was harmless. Because of that, and because certain comments, although improper, are not illustrative of a pattern of repetitive misconduct, we AFFIRM the conviction.

## I. Procedural History

This case arises from a minor rear-end traffic collision on the evening of Saturday, March 23, 2019. State troopers arrested motorist John Trala following that incident, and

---

[1] *See* 21 *Del. C.* § 4177(a)(1) (prohibiting any person from driving a vehicle "[w]hen the person is under the influence of alcohol."); 21 *Del. C.* § 4177(a)(5) (prohibiting any person from driving a vehicle "[w]hen the person's alcohol concentration is, within 4 hours after the time of driving .08 or more.").

the State held a preliminary hearing five days later.[2] On April 22, 2019, the grand jury indicted Trala on two counts, Driving Under the Influence (DUI) and Following a Vehicle Too Closely.[3] The Superior Court held a jury trial beginning September 16, 2019.[4] The jury issued its verdict two days later, convicting Trala of DUI but acquitting him of Following a Vehicle Too Closely.[5]

On November 14, 2019, the Superior Court sentenced Trala as a seven-time DUI offender.[6] The judgment of sentence included a fifteen-year term at Level V supervision suspended after five years and completion of Key and Reflections programs, and a $10,000 fine of which $7,500 was suspended.[7]

## II.    Factual Record

On the evening of March 23, 2019, Trala rear-ended another vehicle on Route 9 in Lewes in Sussex County, Delaware while that vehicle had stopped at a light at the Route 9 intersection with Route 1.[8] The passenger in the other vehicle, a retired police officer, called 9-1-1. The jury heard the recorded 9-1-1 call[9] in which the passenger described the

---

[2] App. to Op. Br. at A1 (Superior Court Criminal Docket).

[3] *Id*. at A8 (Indictment); *see also* 21 *Del. C.* § 4177(a) (Driving Under the Influence); 21 *Del. C.* § 4123 (Following A Vehicle Too Closely).

[4] *Id*. at A4 (Superior Court Criminal Docket).

[5] App. to Op. Br. at A83 (Jury Verdict).

[6] Op. Br. Ex. B.

[7] *Id*. A person who is convicted of a seventh offense DUI is guilty of a class C felony and shall be fined "not more than $15,000 and imprisoned not less than 5 years nor greater than 15 years." 21 *Del. C.* § 4177(d)(7).

[8] App. to Ans. Br. at B5, B10 (Testimony of Frank J. DeGrand).

[9] State's Ex. 1.

collision and told the dispatcher that the other driver was drunk.[10] The passenger authenticated his voice on the tape and identified Trala as the other driver.[11] He testified that he believed Trala was drunk because Trala was slurring his words and yelling, and having difficulty balancing.

Trooper Michelle Galiani of the Delaware State Police responded to the call.[12] Her vehicle's audio-visual recording equipment captured the interaction and the recording was admitted into evidence. In the recording, Trala concedes that he rear-ended the other vehicle, but claims that it had stopped at a green light.[13] He initially denied having consumed any alcohol.[14] When Trooper Galiani confronted him about the smell of alcohol emanating from his person, he gave different accounts about when he had consumed two beers and eventually described his drinking as having occurred at "[o]ne, two [in the afternoon]."[15]

Trooper Galiani testified that she observed Trala as having slurred speech, bloodshot and glassy eyes, and an odor of alcohol.[16] She conducted field sobriety tests, which were audible but out of view of the vehicle's recording equipment.[17]

---

[10] *Id*. at 00:37-00:40.

[11] App. to Ans. Br. at B7 (Testimony of Frank J. DeGrand).

[12] *Id*. at B12, B14 (Testimony of Trooper Michelle Galiani).

[13] State's Ex. 6 at 2:35-2:40.

[14] *Id*. at 3:40-3:43.

[15] *Id*. at 3:43-4:00.

[16] App. to Ans. Br. at B18–19 (Testimony of Trooper Michelle Galiani).

[17] *Id*. at B19; State's Ex. 6 at 7:50-11:40.

Trala continuously interrupted Trooper Galiani when she gave instructions as to the walk-and-turn test and one-leg stand, and, according to her testimony, he had difficulty performing them apparently due to pain or injury in his knee.[18] He also failed to properly perform the alphabet and counting field sobriety exams.[19] He failed to stop at the assigned letter in the alphabet, and while counting down from 69 he skipped the numbers 68 through 60.[20] He counted other numbers out of order, and on finishing, he reflected that he had not counted correctly, but declined Trooper Galiani's offer to try again.[21] Following these tests, she administered a portable breath test to Trala who, after several attempts, produced a result of a 0.08 blood alcohol concentration.[22] Trooper Galiani testified that Trala was sucking in breath instead of blowing at the appropriate time, and stated that because of this, she believed that the breath sample was of poor quality.[23] Lastly, Trooper Galiani procured the services of phlebotomist Serena Hall to perform a blood alcohol test. Trooper Galiani also explained the documented chain of custody on the test kit.[24]

Hall explained that she deviated slightly from the kit's default protocols by using a 21-gauge butterfly needle as opposed to the 16-gauge needle provided in the kit.[25] Hall

---

[18] App. to Ans. Br. at B21–22 (Testimony of Trooper Michelle Galiani).

[19] *Id*. at B23–24.

[20] *Id*.

[21] State's Ex. 6 at 11:20–11:44.

[22] App. to Ans. Br. at B25 (Testimony of Trooper Galiani). The results of the portable breath test were admitted without objection. *Id*.

[23] *Id*.

[24] *Id*. at B28.

[25] *Id*. at B36 (Testimony of Phlebotomist Serena Danielle Hall).

testified that she made a standard practice of using 21-gauge needles in lieu of the standard kit needle because she believed that the smaller needle size reduced patient pain and improved safety for both patient and provider.

Finally, the State proffered the expert testimony of forensic chemist Holly Fox.[26] Fox explained the procedures she undertook testing Trala's blood sample with the gas chromatograph, including placing the sample in a "rocker" that mixes it thoroughly. Her conclusion, having tested the blood, was that it contained 0.15 grams per 100 milliliters.

In closing arguments, Trala's counsel attacked Hall's failure to follow the kit's instructions by failing to note her substitution of needles in the chemical test report's remarks column.[27] He urged the jury to consider that other discrepancies may also have occurred but may have gone undocumented. He also urged the jury to question whether Fox's testimony as to her testing procedures was sufficiently credible to allow her report of Trala's blood alcohol level to meet the State's burden of proof.

In rebuttal closing argument, the State pointed out that Trooper Galiani did not base her inference that Trala was intoxicated on his poor balance in the walk-and-turn and one-leg test. The State argued to the jury that "*you heard Trooper Galiani testify that she didn't count those tests against defendant, and if anything goes to her credibility, I think it's that statement right there.*"[28]

---

[26] *Id*. at B40 (Testimony of Chemist Holly Fox).

[27] App. to Op. Br. at A37 (Defense Closing Arguments).

[28] *Id*. at A48 (State's Rebuttal) (emphasis added).

6

Additionally, the State argued to the jury that "*[t]here was never an objection during testimony as to whether or not there was proper blood collection*." As for testing protocols, "*there was also never an objection made as to whether or not testing protocols were followed.*"[29] The State went on to declare that "*there was no objection that the phlebotomist didn't follow the appropriate procedures when performing the blood draw of the defendant.*"[30]

The State continued to use this "no objection" formulation in its discussion of Fox's testimony, asserting that "*defense didn't object that she wasn't qualified to be in that position.*" [31] Further, "*[h]e didn't object that she wasn't qualified to perform duties in that position, and he didn't object that she wasn't qualified to analyze blood samples for the presence of alcohol.*"[32] With respect to the gas chromatograph, the State asserted, "*[t]here was no objection from defense counsel that the machine wasn't working properly that day.*"[33] And as to the possible inaccuracy of the machine, the State argued that "if [defense counsel] was so upset by the fact that Ms. Fox didn't know the error rate, *how come he didn't object to the certificate of analysis coming into evidence? How come he didn't object to you seeing that 0.15 that is the defendant's blood alcohol concentration on that date*?"[34]

---

[29] *Id*. at A49 (emphasis added).

[30] *Id*. at A51 (emphasis added).

[31] *Id*. (emphasis added).

[32] *Id*. (emphasis added).

[33] *Id*. at A51–52 (emphasis added).

[34] *Id*. at A52 (emphasis added).

Although defense counsel initially did not object to these statements, when the State invoked this "no objection" formulation for the tenth time, defense counsel requested a sidebar and objected.[35] Asserting that the "no objection" argument improperly led the jury to believe that failure to object meant that either the defendant or his counsel had conceded the credibility of the evidence, Trala's attorney requested a mistrial.[36] The Court denied that request, but instructed the jury to "disregard all of those references to objection, okay, in [the State's] closing comments."[37]

The following day, after the jury had already deliberated for more than two hours the day before, and after determining that an additional curative instruction was necessary, the Court previewed such instruction with the parties.[38] The parties accepted it without modification.[39] The Court subsequently delivered the instruction to the jury, telling them:

> Whether evidence is admissible or inadmissible is [a] matter for me to decide. So lawyer objections matter to me because they help me decide whether or not something should come in or shouldn't come in. They don't matter to you. Once I decide to admit evidence, then it is your province as jurors to make what you will of that evidence. You can believe it or disbelieve it. You can be persuaded by it or not persuade[d] by it. Whether [defense counsel] objected or didn't object doesn't matter for your purposes. It matters for my purposes.
>
> So I just wanted to tell you why. Like I said, once evidence has been admitted, it's there for your consideration. You can be persuaded by it or not persuaded by it. It is within your province to accept it or reject it. You might

---

[35] *Id*. at A53.

[36] *Id*. at A53–54.

[37] *Id*. at A56.

[38] *Id*. at A67–68 (Proceedings in Chambers).

[39] *Id*. at A68.

8

believe it or disbelieve it. You may put a lot of weight on it or a little weight or no weight. So that is all your province.[40]

The jury subsequently convicted Trala of DUI but acquitted him of the other charge of Following a Vehicle Too Closely.[41] The jury specifically found that Trala had driven both while under the influence of alcohol, and that he had driven when his blood alcohol concentration exceeded the legal limit within four hours.

### III.    The Contentions of the Parties on Appeal

Trala appeals on two grounds. First, he asserts that the trial court abused its discretion in responding to the improper '*no objection*' remarks from the State with a "deficient attempted curative instruction to disregard rather than [by] granting the Defendant's motion for a mistrial."[42] Second, he argues that the Superior Court erred in denying his motion for a mistrial because of the State's improper bolstering of Trooper Galiani's credibility with the "if anything goes to her credibility, I think it's that statement right there" remark, either on its own or together with the improper 'no objection' rebuttal arguments.[43]

The State argues that the 'no objection' statements were accurate and supported by the record, which, in its view, should end the inquiry. In the alternative, if the Court were to find the remarks improper, the State argues that the judge's curative instructions were an adequate remedy sufficient to cure any infirmity and support the trial judge's

---

[40] *Id*. at A79–80 (Second Curative Instruction) (bracketed alterations added).

[41] *Id*. at A84–87 (Jury Verdict).

[42] Op. Br. at 11.

[43] *Id*. at 22.

9

discretionary decision not to grant a mistrial. As to the "*I think*" statement, the State argues that because the statement called upon the jury to infer credibility solely based on properly admitted evidence rather than implying private knowledge as a prosecutor, there was no improper vouching.

### IV. Standard of Review

Because Trala timely objected and a sought mistrial for the "no objection" remarks, that argument is preserved on appeal. Under such circumstances, "[t]his Court reviews a trial court's denial of a motion for a mistrial under an abuse of discretion standard."[44] "A trial judge should grant a mistrial only where there is a 'manifest necessity' or 'the ends of public justice would otherwise be defeated.'"[45] A mistrial is mandated "only when there are no meaningful and practical alternatives to that remedy."[46] "Prejudicial error will normally be cured by the trial judge's instructions to the jury."[47] But, where a prosecutor's words seek to discredit defense counsel in the presence of the jury, even subsequent jury instructions may not be adequate to ensure that the defendant receives a fair trial.[48] "The trial judge is in the best position" to determine whether a mistrial is necessary.[49] Absent

---

[44] *Ray v. State*, 170 A.3d 777, 2017 WL 3166391, at *4 (Del. July 25, 2017) (TABLE) (quoting *MacDonald v. State*, 816 A.2d 750, 753 (Del. 2003)).

[45] *Ray*, at *4 (citing *Steckel v. State*, 711 A.2d 5, 11 (Del. 1998) (quoting *Fanning v. Superior Court*, 320 A.2d 343, 345 (Del. 1974)).

[46] *Dawson v. State*, 637 A.2d 57, 62 (Del. 1994) (quoting *Bailey v. State*, 521 A.2d 1069, 1077 (Del. 1987)).

[47] *Id.*

[48] *See Walker v. State*, 790 A.2d 1214, 1220 (Del. 2002) (citation omitted).

[49] *Bowe v. State*, 514 A.2d 408, 410 (Del. 1986).

10

an abuse of the trial judge's exercise of discretion in making that determination, this Court will not disturb that decision.[50]

By contrast, Trala did not object to the State's "*I think*" rebuttal remark. "Generally, questions not fairly presented to the trial court are not considered on appeal, unless 'the interests of justice' mandate such consideration."[51] Under the interests of justice exception, this court will consider only plain error that is limited to "material defects which are apparent on the face of the record; which are basic, serious, and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[52]

## V.     Analysis

### A.  Standards to Be Applied to Claims of Prosecutorial Misconduct

Recently, in *Saavedra v. State*,[53] we explained the application of these standards of review in the context of claims raised on appeal based upon alleged prosecutorial misconduct. There we said that if the claim was not fairly considered below because a timely objection was not made and the judge failed to address the conduct *sua sponte*, we engage in a plain error analysis. First, we examine the record *de novo* to determine whether

---

[50] *Id.*

[51] *Burrell v. State*, 953 A.2d 957, 963 (Del. 2008); *see also* Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.").

[52] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986) (citing *Bromwell v. State*, 427 A.2d 884, 893 n.12 (Del. 1981)).

[53] 225 A.3d 364 (Del. 2020).

prosecutorial misconduct occurred. If we determine that no misconduct occurred, our analysis ends. If we find misconduct, then we apply the standard announced in *Wainwright v. State*,[54] to determine whether the error complained of is so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process.[55] According to *Wainwright*,

> "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process" . . .
>
> and "the doctrine of plain error is limited to material defects which are apparent on the face of the record[,] which are basic, serious[,] and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[56]

If we find plain error under the *Wainwright* standard, we reverse. If we conclude that the misconduct would not warrant reversal under the *Wainwright* standard, we proceed to apply our analysis in *Hunter v. State*[57] as the third analytical step, and we consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.[58] As we reiterated in *Saavedra*, under *Hunter*, even where we are unable to conclude that the prosecutor's misconduct was so prejudicial as to compromise the fairness of the trial process, we may yet reverse where the misconduct is part of a "persistent pattern of prosecutorial misconduct" over different trials such that a

---

[54] 504 A.2d 1096 (Del. 1986).

[55] *See Baker*, 906 A.2d 139, 150 (Del. Supr. 2006).

[56] *Wainwright*, 504 A.2d at 1100.

[57] 815 A.2d 730 (Del. 2002).

[58] *Baker*, 906 A.2d at 150.

failure to reverse would compromise the integrity of the judicial process.[59] "Under the *Hunter* test we *can* reverse, but need not do so,"[60] especially where other ways of dealing with the misconduct such as a referral to the Attorney General for internal discipline or to the Office of Disciplinary Counsel are more appropriate.[61]

Where, as with Trala's "*no objection*" issue, defense counsel raises a timely objection or the trial judge addressed the issue *sua sponte*, then we review the alleged prosecutorial misconduct at issue for harmless error. In *Baker v. State*, this Court described our harmless-error analysis as applied to prosecutorial misconduct:

> The first step in the harmless error analysis involves a *de novo* review of the record to determine whether misconduct actually occurred. If we determine that no misconduct occurred, our analysis ends there. If, however, we determine that the trial prosecutor did engage in misconduct, we move to the second step in the analysis, because not every instance of prosecutorial misconduct requires reversal. Only improper comments or conduct that prejudicially affect the defendant's substantial rights warrant a reversal of his conviction. To determine whether prosecutorial misconduct prejudicially affects a defendant's substantial rights, we apply the three factors of the *Hughes* test, which are: (1) the closeness of the case, (2) the centrality of the issue affected by the error, and (3) the steps taken to mitigate the effects of the error. The factors in the *Hughes* test are not conjunctive and do not have the same impact in every case; for example, one factor may outweigh the other two. Moreover, we apply the test itself in a contextual, case-by-case, and fact sensitive manner.[62]

---

[59] *Id.* at 737–38.

[60] *Baker*, 906 A.2d at 149.

[61] *Saavedra*, 225 A.3d at 373.

[62] *Baker*, 906 A.2d at 148–149 (citations omitted); *see also Hughes v. State*, 437 A.2d 559 (Del. 1981).

If we conclude that prosecutorial misconduct has occurred but that reversal is not warranted because of the failure to meet the *Hughes* standard, then we proceed to apply our analysis in *Hunter*. With that analytical backdrop, we address Trala's two assignments of error -- first, the "vouching" issue, and second, the "no objection" issue.

> B. *The State's Trial Argument as to Trooper Galiani's Credibility Did Not Impair Trala's Substantial Rights and We Find No Plain Error*

Trala's "vouching" issue falls into our plain error standard of review because he failed to object to this comment during trial. A prosecutor may characterize the credibility of a statement only through "relat[ing] his argument to specific evidence which tends to show that the testimony or statement" accords with the characterization.[63] Because of this restriction, "the use of the word 'I' is often problematic when used by a prosecutor referring to evidence,"[64] but there is no *per se* rule forbidding it.[65] Rather, our cases often turn on the context in which the statements were made. The Court will not find plain error where the statement is limited to the prosecutor urging the jury to make a particular inference based solely on the evidence presented.[66] Where the alleged vouching does no more than suggest a legitimate and logical inference from the evidence presented at trial, and does not suggest awareness of any other information outside the record, no prosecutorial misconduct

---

[63] *Warren v. State*, 774 A.2d 246, 256 (Del. 2001).

[64] *Derose v. State*, 840 A.2d 615, 621 (Del. 2003); *see also Moreta v. State*, 210 A.3d 142 (Del. 2019) ("The prosecution must refrain from using language in a trial that smacks of personal opinion, superior knowledge, or vouching.").

[65] *Swan v. State*, 820 A.2d 342, 356 n.35 (Del. 2003) (citing *Cousins v. State*, 793 A.2d 1249, 2001 Del. Lexis 513, *3 2001 WL 1353571 (Del. Nov. 2, 2001) (TABLE)).

[66] *Derose*, 840 A.2d at 621.

occurs.[67] Instead, "[i]mproper vouching occurs when the prosecutor implies some personal superior knowledge, beyond that logically inferred from the evidence at trial, that the witness has testified truthfully."[68]

The best practice, as we noted in *Brokenbrough v. State*, is to assiduously avoid use of the word "I."[69] In that case, we endorsed the Third Circuit's analysis in *United States v. LeFevre*[70] which "condemned expressions of personal opinion by prosecutors relating to credibility and guilt, even when it was clear that the comments of personal opinion by the prosecutor in his closing argument were based on the evidence."[71] This condemnation flows from the possibility that the authority and respect the office of the prosecutor commands may "induce the jury to trust the Government's judgment rather than its own view of the evidence."[72] The prosecutor has a duty to take care that the argument the State

---

[67] *Booze v. State*, 919 A.2d 561, 2007 WL 445969, at *4 (Del. Feb. 13, 2007) (TABLE).

[68] *White v. State*, 816 A.2d 776, 779 (Del. 2003); *see also Ruffin v. State*, 205 A.3d 822, 2019 WL 719038, at *2 (Del. Feb. 19, 2019) (TABLE) (same) (citing *Saunders v. State*, 602 A.2d 623, 624 (Del. 1984)); *Warren v. State*, 774 A.2d at 256 (stating that, "[d]uring closing arguments, a prosecutor may not misrepresent the legal effect of the defendant's statements and may not express personal opinions about the credibility of witnesses.").

[69] *See Brokenbrough v. State*, 522 A.2d 851, 859 (Del. 1987) ("the ABA Commentators indicate that the experienced American and British advocate will often say 'I leave it to you whether this evidence does not suggest . . .'. There is a great difference in 'leaving' a point before the jury and 'suggesting' it personally. Nevertheless, arguments in the first person are extremely dangerous and should be assiduously avoided.").

[70] 483 F.2d 477 (3d Cir. 1973).

[71] *Brokenbrough*, 522 A.2d at 859.

[72] *United States v. Young*, 470 U.S. 1, 18-19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *see also Rasin v. State*, 187 A.3d 1209, 2018 WL 2355941, at *2 (Del. May 23, 2018) (TABLE) ("Witness vouching is 'a special concern because jurors may easily interpret vouching by the prosecutor as an official endorsement of the witness,' given their position of authority and implied superior knowledge, 'and in doing so, overlook important aspects of the witness' credibility.'") (citations omitted).

presents to the jury stands or falls on its own merit, rather than relying, even unintentionally, on the respect and deference to which the public gives the prosecutor's office. Based on our examination of the record, the prosecutor's isolated verbal slip lacks the "serious" and "fundamental" character necessary to satisfy plain error review and generate reversible error.

### C. The State's "No Objection" Line of Argument Was Highly Improper But Does Not Merit Reversal

Trala's second "no objection" issue is more troubling. As this Court explained in *Escalera v. State*,[73] "prosecutors are allowed to 'comment on evidence and the reasonable inferences therefrom,' provided they stay within the bounds of 'the facts of the case' and do not 'misstate the evidence or mislead the jury as to the inferences it may draw.'"[74] An improper remark does not require a new trial unless it prejudicially affected the substantial rights of the accused.[75] As noted above, we engage in a harmless error inquiry. First, we review the prosecutor's actions *de novo* to determine if they were improper. Second, if they were improper, we apply the *Hughes* test.

Following this formulation, we conclude that the "no objection" comments were improper. The decision whether to admit or exclude evidence normally rests in the trial judge's discretion.[76] Delaware trial judges make those decisions based on the Delaware

---

[73] 187 A.3d 1249, 2018 WL 2406009, at *2 (Del. May 25, 2018) (TABLE).

[74] *Id*. (citing *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004) (quoting *Sexton v. State*, 397 A.2d 540, 545 (Del. 1979))).

[75] *Id*.

[76] *Capano v. State*, 781 A.2d 556, 586 (Del. 2001).

16

Rules of Evidence,[77] constitutional restraints, statutory law, decisional law and court rules.[78] To preserve a claim of error in admission or exclusion of evidence, a party must make a timely objection on the record.[79] The objections themselves are not evidence.[80] It follows that neither is the absence of an objection evidence. As the trial court correctly instructed the jury in this case:

> "Evidence consists of testimony from witnesses testifying from the witness stand and exhibits introduced through their testimony. It is this evidence only which you may consider in reaching your verdicts."[81]

Counsel, in closing arguments, enjoy a certain latitude to discuss the evidence, the reasonable inferences therefrom, and the appropriate law and its application to the evidence.[82] By tradition, objections in closing argument are discouraged, which heightens the burden on a trial judge to act *sua sponte* to prevent improper argument.[83] This latitude does not permit a prosecutor to extend "an invitation for the jury to reach a decision on matters outside the evidence introduced at trial."[84]

---

[77] *Tumlinson v. Advanced Micro Devices, Inc.*, 2012 WL 1415777, at *2 (Del. Super. Jan. 6, 2012).

[78] *Capano*, 781 A.2d at 586.

[79] D.R.E. 103.

[80] *See United States v. Barsoum*, 763 F.3d 1321, 1340 (11th Cir. 2014) (affirming denial of mistrial in view of the sufficiency of a curative instruction telling the jury that "objections are not evidence"); *United States v. Campbell*, 317 F.3d 597, 607 (6th Cir. 2003) (same); *United States v. Gundersen*, 195 F.3d 1035, 1038 (8th Cir. 1999) (same).

[81] App. to Ans. Br. at B44 (Jury Instructions).

[82] *Hooks v. State*, 416 A.2d 189, 203 (Del. 1980).

[83] *Id.*

[84] *Walker v. State*, 790 A.2d 1214, 1219 (Del. 2002).

But that is what happened here. In its closing rebuttal, the State invited the jury to infer that defense counsel had essentially conceded the credibility of the chemical blood analysis evidence on the basis of counsel's failure to object to its introduction.[85] Because a failure to object is not evidence, the prosecutor's "no objection" comments were an improper appeal to matters outside the evidence.

Because a timely objection was made during trial, we next review for harmless error under *Hughes*. As to the first *Hughes* factor, the closeness of the case, the case is not close in any sense. Because Trala concedes that he was driving and that he drank, either impairment from alcohol intoxication or proof his blood alcohol concentration was over 0.08 percent within four hours establishes the offense.[86] The chemical blood analysis, once admitted into evidence, constituted overwhelming evidence of his guilt.

---

[85] We have previously emphasized that the closing rebuttal is a particularly egregious occasion for improper argument. *See Kirkley v. State*, 41 A.3d 372, 377 (Del. 2012) (stating that "the prosecutor began his *closing rebuttal* argument with" the improper vouching at issue in that case) (emphasis in original). *Id*. To make the reasoning explicit, an improper argument in a prosecutor's rebuttal leaves a defendant with no opportunity to respond. *See United States v. Torres-Colon*, 790 F.3d 26, 34 (1st Cir. 2015) ("We view problematic statements during rebuttal with particular scrutiny, because the government's rebuttal argument offers the last word before the jury begins deliberations.").

[86] *See* 21 *Del. C.* § 4177(a):

No person shall drive of vehicle:

(1) When the person is under the influence of alcohol;

. . . or

(5) When the person's alcohol concentration is, within 4 hours after the time of driving .08 or more. Notwithstanding any other provision of law to the contrary, a person is guilty under this subsection, without regard to the person's alcohol concentration at the time of driving, if the person's alcohol concentration is, within 4 hours after the time of driving .08 or more and that alcohol concentration is the result of an amount of alcohol present in, or consumed by the person when that person was driving."

18

But more importantly, aside from the chemical blood analysis, the jury found that Trala was under the influence of alcohol. That finding is supported by overwhelming testamentary and video evidence. To wit, the passenger in the other vehicle and Trooper Galiani both contemporaneously perceived of Trala as intoxicated and remarked upon it. At trial, they testified as to what factors formed that impression. To the extent that those factors are susceptible to audiovideo confirmation, the recording corroborates them and allowed the jury to form their own impression. The other passenger corroborated Trooper Galiani's perception about the odor of alcohol, and the recording shows that Trala changed his story to concede his alcohol consumption when confronted about it. He can likewise be heard failing to complete a simple counting exercise, and then declining an opportunity to correct himself. Under the weight of their testimony and supporting video evidence, the case is not close, and so the first factor weighs strongly against relief.

The second *Hughes* factor addresses the centrality of the issue affected by the purported error. The chemical blood analysis is a central issue pertaining to whether he committed DUI by driving while exceeding the maximum legal blood alcohol concentration. This factor strongly favors Trala, though only with respect to one of the two theories of liability which the jury found against him.

As to the third *Hughes* factor, the trial judge issued two different curative instructions, one immediately,[87] and a longer and more detailed instruction the following

---

[87] App. to Op. Br. at A56 (State's Rebuttal Argument).

19

day.[88] We note that Trala's trial counsel, an experienced lawyer, let approximately ten "no objection" comments pass before he objected. We stated in *Baker* that, "just as we have continuously admonished prosecutors to refrain from engaging in misconduct at trial, we have likewise admonished defense counsel to raise timely objections to that misconduct."[89] As we explained there, "[t]imely objections to prosecutorial misconduct give the trial prosecutor an opportunity to respond to the allegations of misconduct in the first instance and, more importantly, give the trial judge the opportunity to consider whether misconduct in fact occurred and if so what, if anything should be done to remedy it."[90] Those instructions "are presumed to cure error and adequately direct the jury to disregard improper statements."[91]

The Court contemporaneously recognized the State's improper argument and immediately instructed the jury to address the issue. The following day, the judge delivered the more detailed instruction, approved by counsel. Juries are presumed to follow the trial

---

[88] App. to Op. Br. at A79–81 (Additional Jury Instructions).

[89] *Baker*, 906 A.2d at 148.

[90] *Id.*

[91] *Revel v. State*, 956 A.2d 23, 27 (Del. 2008) (quoting *Pena v. State*, 856 A.2d 548, 551 (Del. 2004)); *see also Galindez v. State*, 220 A.3d 912, 2019 WL 518842, at *3 (Del. Oct. 14, 2019) (TABLE) (curative instructions are presumed to be followed) (citing *Justice v. State*, 847 A.2d 1097, 1100–01 (Del. 2008)). Although Trala challenges the sufficiency of the second curative instruction in his opening brief, he did not separately object to it below. He asserts that his challenge to it is preserved by virtue of his initial motion for a mistrial. He acknowledges that "it may have been legally accurate purely as a matter of law," but he argues that the "jurors should only have been told that they should completely disregard the State's argument. . . ." Op. Br. at 16–17. The curative instructions certainly could have been better crafted. However, we do not believe they provide a basis for reversible error regardless of the standard of review applied.

20

judge's instructions.[92]  Although it was improper for the State to urge the jury to infer that evidence was credible because it was admitted without objection, based on *Hughes*, we can conclude that this misconduct was harmless in Trala's case.  Thus, *Hughes* provides no basis for relief for Trala's allegations of misconduct.

But that does not end our inquiry as Trala also contends that the prosecutor's remarks ran afoul of *Hunter v. State*.[93]  In *Hunter v. State*, we articulated an additional rule applicable in cases of prosecutorial misconduct:

> [I]n addition to applying the three part test announced in *Hughes v. State*, we will consider whether the prosecutor's statements are repetitive errors that require reversal because they cast doubt on the integrity of the judicial process.  Where, as here, several of the prosecutor's comments have been specifically identified as improper in past decisions, we conclude that reversal is mandated.[94]

Repetitive errors threaten the "integrity of the judicial process" because they demonstrate that "our prior judicial admonitions short of reversal are falling on deaf ears."[95]  As we made clear in *Saavedra*, we do not look to the repetition of errors within a specific trial, rather, we look to "repetitions of the same errors over multiple trials, which reflects a disregard of our prior admonitions and thus impugns the integrity of the judicial process."[96]  Thus, a defendant seeking relief under the *Hunter* test must be able to demonstrate a pattern

---

[92] *See Phillips v. State*, 154 A.3d 1146, 1154 (Del. 2017).

[93] 815 A.2d 730, 732 (Del. 2002) (per curiam) ("The prosecutor in this case forces us to add another admonition to the list: do not disparage the "reasonable doubt" standard that governs the jury's determination of guilt.").

[94] *Id.* at 733 (footnote omitted).

[95] *Saavedra*, 225 A.3d at 383 n.89.

[96] 225 A.3d at 383.

of disregard of this Court's repeated pronouncements.[97]  It is this disregard that justifies relief, not the defendant's own substantive rights, since the *Hunter* test is only applied after the alleged misconduct has been found harmless under *Hughes*.[98]

Trala has not adequately demonstrated the requisite pattern of misconduct.  To be clear, the State's "no objection" comments were entirely improper and there are cases that make the impropriety clear.  In *Sexton v. State*, for example, the prosecutor told the jury that if the State's evidence "were not reasonable and credible, that the Trial Judge would not have let her present it."[99]  On appeal, the State admitted that the remark was improper.[100] We found that "[t]he prosecutor's remark that the Trial Judge would not have admitted the State's evidence if it were not reasonable and credible was clearly improper because it insinuated that the Trial Judge believed defendant guilty."[101]  Nor was the *Sexton* Court promulgating a novel rule.  It is elementary in our system of trial by jury that counsel should not urge jurors to decide a question based simply on the fact that certain evidence was admitted.

---

[97] In *Hunter* itself, the State had made multiple improper remarks which "cover several of the specific categories of comment that have been prohibited in past decisions."  *Hunter*, 815 A.2d at 738.

[98] *Baker v. State*, 906 A.2d 139, 149 (Del. 2006).  As we noted in *Baker*, even when the *Hunter* test is satisfied, reversal is only one possible sanction which the Court can craft to address the harm which flowed to the judicial process, rather than to the defendant.  *Id*.

[99] 397 A.2d 540, 543 (Del. 1979).

[100] *Id*.  The State sought to avoid reversal by arguing harmless error.  *Id*.

[101] *Id*. at 544.

But *Sexton* was decided more than 40 years ago. Two such instances of improper conduct separated by four decades do not form a pattern.[102] Trala attempts to connect his own case with one of the more recent improper arguments in *Hunter* itself, and to another case, *Mason v. State*.[103] In *Hunter*, the State suggested to the jury that the burden of overcoming reasonable doubt was a sophisticated trick by which defense counsel sought to 'fool' them.[104] In *Mason*, the State pointed out defense counsel's failure to cross-examine the victim on an issue of fact to corroborate evidence from the defense witnesses, and argued that failure to do so reflected defense counsel's understanding that the defense witnesses had been mistaken.[105]

The situation addressed in *Hunter* is not analogous to the one presently before us. The *Hunter* prosecutor was "challenging the jury to reject reasonable doubt as the standard of proof."[106] Here the State was urging the jury to rely on a factor outside the evidentiary record. Both are improper, but the errors are not closely related.

*Mason* lands nearer the mark. The State's argument in *Mason* was that defense counsel would have behaved differently had he believed the defense evidence.[107] Here, the

---

[102] We have previously declined to find a "pattern of misconduct" in the State's behavior based on two incidents where they occurred eight years apart and had distinguishable facts. *State v. Robinson*, 209 A.3d 25, 59 (Del. 2019).

[103] 658 A.2d 994 (Del. 1995).

[104] *Hunter*, 815 A.2d at 736.

[105] *Mason*, 658 A.2d at 998.

[106] *Hunter*, 815 A.2d at 736.

[107] *See Mason*, 658 A.2d at 998 ("'Certainly [the defense witness] wants to believe it, and if the defense attorney really believed it, why didn't he ask [the victim] about the supposed stuffed

State argued that counsel would have behaved differently if he doubted the State's evidence. Just as we found the behavior improper in *Mason*, it is improper here. But, *Mason* was decided more than twenty-five years ago. Although *Sexton* and *Mason* support Trala's argument that the State's comments were improper, we decline to find that there is a sufficient repetition of this error to constitute a pattern of misconduct which reflects a disregard of our prior admonitions. Notwithstanding the gaps in time in this decisional law, the point is sufficiently fundamental and established that the State should have been aware of the improper nature of the comments.

Accordingly, although the "no objection" comments do not lead us to reverse under *Hunter*, the State's repeated failure to acknowledge the impropriety is troubling. When trial judge explained the admissibility/credibility distinction at sidebar,[108] the State should have recognized the error. Yet, on appeal the State in its brief continued to insist that "the remarks were proper" and constituted "fair comment."[109] The State's insistence continued at oral arguments, even though the State acknowledged that objections (or lack thereof) are not evidence.[110] Instead, the State merely posited that the issue was difficult and pledged

---

animal? Because it never happened, and [the defense witness] was just confused.'") (brackets in original).

[108] *See id*. at 54–55 ("I admitted them because they're admissible, but the jury is always free to disbelieve anything that came in. They can say '[w]ell, she is just way off on that 0.5. You know she knows so that is good enough for me.' That comes in, but they may still disbelieve it. That's why it comes in, but still it may be not there.").

[109] Ans. Br. at 13–14.

[110] *See* Oral Argument video, 18:46 – 20:42, https://livestream.com/accounts/5969852/events/9319200/videos/212376812/player:

> Valihura, J.: "Does the State agree that the 'no objection' comments were improper?"

that if an unfavorable ruling were issued by this Court, it would act ensure that all

prosecutors avoid this line of argumentation in the future.[111]

Though we decline to find a pattern of such misconduct, that does not excuse the

State from being aware of its error since the mistake was one of fundamental evidence

law.[112] In *Walker v. State*, for example, this Court stated:

> Although the prosecutor has wide latitude in summation, he or she may not
> employ argument to denigrate the role of defense counsel 'by injecting his
> [or her] personal frustration with defense tactics. The latitude afforded the
> prosecutor does not permit an invitation for the jury to reach a decision on
> matters outside the evidence introduced at trial. This Court has quoted with
> approval, the American Bar Association's Standards for Criminal Justice 4–
> 7.8(d) that "[a] lawyer [in closing argument] should refrain from argument

---

The State: "Well, short answer is I'm not sure, your Honor. I've never, as [defense counsel] said, I've never seen this particular species of argument before. And I think to try to explain the answer a little bit more – what the prosecutor said was not inaccurate. I mean, there were not objections made to seven specific matters that the prosecutor identified in rebuttal. So she was not mischaracterizing what the record was in this particular case. And I think the situation is, well, she didn't mischaracterize it, and the jury had already seen all this evidence come in. And the jury were paying attention, would certainly be aware that there were no objections. So in that respect all the prosecutor was doing was stating something that was really cumulative with what the jury had already viewed in this particular case. It was not an inaccurate statement.

Traynor, J.: "Mr. Williams, perhaps building on that question, is a lawyer's failure to object probative of anything? Is it evidence on which it is fair to comment during closing argument?"

The State: "No I don't think it is evidence."

Traynor, J.: "Then why is it proper then to comment and make argument from it in closing argument?"

The State: "Well I guess that's the bigger issue, or the more complex issue."

[111] *See id.* at 22:17 – 22:35 ("I think the issue is even if you assume that that isn't proper, it's certainly problematic and depending on what guidance this Court furnishes about it I'm certainly going to tell the prosecutors not to make the argument because you're just creating potential issues on appeal.").

[112] *See State v. Taylor*, 2019 WL 4647669, at *2 (Del. Super. Sept. 23, 2019) ("State's counsel is charged with knowing the limits of permissible inquiry.").

25

which would divert the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused . . . ." Accordingly, the prosecutor is expected to 'refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel.

. . . .

Arguments by the prosecutor to the jury . . . should focus on *evidence* introduced at trial rather than on his or her opinion of defense counsel's personality or trial strategy.[113]

The State's intransigence is especially disquieting when the State remains unwilling to recognize the impropriety of its conduct on appeal, after having had greater opportunity to reflect on and analyze the trial record.[114] We expect the State to undertake appropriate measures to address this Court's concerns. Future instances of such conduct, in the face of this opinion, may well trigger reversal under *Hunter*.

## VI. Conclusion

For the forgoing reasons, and with that sanction, the judgment of the Superior Court is AFFIRMED.

---

[113] 790 A.2d at 1219–20 (emphasis in original).

[114] *See Robinson*, 209 A.3d 25, 60 (Del. Supr. 2019) ("We are troubled that even during this appeal, the State continued to trivialize the wrongfulness of its conduct.").